IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAR Laboratories LLC,           )
                                )
            Plaintiff,          )
                                )
     v.                         )   No. 12 C 7134
                                )
Great American E&S              )
Insurance Company,              )
                                )
            Defendant.          )

MEMORANDUM OPINION AND ORDER

On September 6, 2012, plaintiff JAR Laboratories sued its insurer, Great American E&S Insurance Company, seeking a declaration that defendant has a duty to defend it in a lawsuit (the "underlying suit") filed by Teikoku Pharma USA ("TPU"). In addition to declaratory relief, plaintiff seeks damages for breach of contract and for vexatious and unreasonable denial of plaintiff's claim. Defendant answered the complaint and asserted numerous counterclaims including its own request for a declaratory judgment that it owed no duty to defend or indemnify plaintiff with respect to the underlying suit.

Now before me are the parties' cross-motions for summary judgment, in which each party seeks judgment in its favor on the respective declaratory claims; plaintiff seeks judgment on its contractual claim and on counts I through VII of defendant's

1

counterclaim; and defendant seeks judgment in its favor on plaintiff's vexatious and unreasonable denial of coverage claim. For the following reasons, plaintiff's motion is granted, and defendant's motion is granted in part.

I.

The bulk of the parties' dispute is over whether defendant must defend plaintiff in the underlying lawsuit, in which TPU, the distributor of a pharmaceutical product called Lidoderm, claims that it was injured by false and misleading representations plaintiff made in the course of promoting its own product, LidoPatch.[1] Except where noted, the following facts are not in dispute.

Defendant issued plaintiff two liability policies (a primary policy and an excess policy, to which I refer collectively as the "policies"), both of which were effective from December 1, 2011, to December 1, 2012. The policies provide coverage for, among other things, "personal and advertising injury" liability, which the policies define to include injury arising out of "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or

---

[1] There appears to be no dispute that despite plaintiff's announcement that LidoPatch would be commercially available beginning in February of 2012, it has never been introduced to the market.

organization's goods, products or services…." GAIC App. 165. [DN 24-11] [2]

The primary policy includes an endorsement containing an "Exclusion of Claims and 'Suits' Alleging Infringement of Intellectual Property" (the "IP Exclusion"). The IP Exclusion states:

**I. Coverage B – Personal and Advertising Injury Liability, 2. Exclusions, I. Infringement of Copyright, Patent, Trademark or Trade Secret, is deleted and replaced by the following:**
**i. Claim or Suit Alleging Infringement of Intellectual Property**

(1) Any claim or "suit" that alleges "personal and advertising injury" arising out of any actual, alleged, or threatened misappropriation, infringement, or violation of any one or more of the following rights or laws:

   a) copyright;

   b) patent;

   c) trademark;

   d) trade name;

   e) trade secret;

   f) trade dress;

   g) service mark;

   h) slogan;

   i) service name;

   j) claim of authorship;

---

[2] Both parties have helpfully attached their exhibits in sequentially-numbered appendices to their respective motions. Although the exhibits are also identified individually by number, for ease of reference I cite only to the page number of the relevant appendix ("GAIC App." for defendant's and "Pl. App." for plaintiff's) and, where helpful, to the docket number at which the cited portion of the appendix was filed.

3

k) other right to or law recognizing an interest in any expression, idea, likeness, name, style of doing business, symbol, or title;

l) laws or regulations concerning piracy, unfair competition, unfair trade practices, or other similar practices; or

m) any other intellectual property right or law.

This exclusion applies whether such misappropriation, infringement, or violation is committed in your "advertisement" or otherwise.

(2) Any other "bodily injury," "property damage," "personal and advertising injury," or medical expenses alleged in a claim or "suit" that also alleges any misappropriation, infringement, or violation excluded by paragraph (1) of this exclusion.

GAIC App. 179 [DN 24-11].

The primary policy also contains an exclusion entitled "Quality or Performance of Goods – Failure to Conform to Statements," which provides:

**2. Exclusions**

This insurance does not apply to:

***

"Personal and advertising injury" arising out of the failure of goods, products, services to conform with any statement of quality or performance made in your "advertisement." GAIC App. 155.

TPU filed suit against plaintiff on March 14, 2012, asserting one count of false advertising under the Lanham Act, 15 U.S.C. §§ 1051 *et. seq.* According to that complaint, TPU is the

subsidiary of a pharmaceutical company that created and manufactures a product called "Lidoderm," a prescription-only patch containing lidocaine that is used as a topical analgesic. TPU's complaint alleges that plaintiff was formed for the "express purpose of manufacturing, marketing and selling an OTC [i.e., over-the-counter] topical patch targeted at the same conditions for which Lidoderm® is prescribed." GAIC App. at 060 [DN 24-3].[3] The complaint alleges that plaintiff issued a press release on February 7, 2012, stating:

> JAR Laboratories announces the launch of their new over-the-counter pain relief patch, LidoPatch®, which contains the same active ingredient as the leading prescription patch. This new product will be ready to ship to distributors and retailers in mid-February and is poised to become a major product in the topical analgesic category. With its proven pain relieving active ingredients, lidocaine, LidoPatch® can provide relief for minor pain associated with: arthritis, simple backache, bursitis, tendonitis muscle strains and sprains. Like the prescription brand, LidoPatch® will provide relief for up to 24 hours. The patches are large, 4"x5 ½" (10cm x 14cm), and can be trimmed to fit.

GAIC App. 061.

The complaint further alleges that before or concurrently with this press release, plaintiff published an advertisement on its website, www.lidopatch.com, which depicted the packaging of LidoPatch and stated:

PAIN RELIEF FOR WHERE IT HURTS!!

---

[3] These citations are to TPU's original complaint, but unless otherwise noted, they also appear verbatim in the amended complaint.

LidoPatch™, with lidocaine, for long lasting pain
relief, and menthol to instantly soothe your
discomfort. The result is a patch that offers real
relief for those painful areas that nag you throughout
the night and day. LidoPatch™ – Relief that lasts all
day, without a prescription!

GAIC App. 062 [DN 24-3].

TPU's complaint further alleges that plaintiff's

marketing strategy for LidoPatch is based on misleading
managed health care companies, pharmacies and consumers
into believing that LidoPatch is merely an OTC version
of Lidoderm® and that the products are otherwise
identical in all material respects. Apart from
choosing a highly similar trade name, [plaintiff] has
implemented its marketing plan portraying LidoPatch as
Lidoderm®'s equivalent, as shown below:

*Id.* This allegation then sets forth a chart that identifies

statements made by plaintiff in different venues and alleges the

"False/Misleading Messages" the statements convey. For example,

the complaint cites the statements, "same active ingredient as

leading prescription patch," "relief that last (sic) all day,

without a prescription!" and "[l]ike the prescription brand,

LidoPatch will provide relief for up to 24 hours" and asserts

that these statements convey the false and misleading messages

that LidoPatch "contains and delivers the same amount of active

ingredient – lidocaine – as Lidoderm®, with the same skin

irritation profile," that "LidoPatch and Lidoderm® can be used to

treat the same indication," and that "LidoPatch and Lidoderm® are

interchangeable." GAIC App. 063.

TPU also alleges that statements such as "fast acting" misleadingly suggest that "clinical testing and/or scientific studies demonstrate that LidoPatch provides immediate pain relief – as fast if not more quickly than Lidoderm®." *Id.* These and other statements comparing the two products are false or misleading, the complaint asserts, because "LidoPatch packaging reflects what appears to be a completely different formulation than Lidoderm®, including different excipients, which are likely to affect lidocaine absorption, adhesiveness and skin irritation," and because plaintiff "has not sought FDA approval of LidoPatch" and has "neither performed, nor had any third party perform, testing, clinical trials or any other scientific methodology to determine the accuracy of the marketing statements [plaintiff] has made regarding LidoPatch's effectiveness." GAIC 064-065.

TPU alleges that it has suffered damages, including "diminished goodwill of Lidoderm and lost profits stemming from reduced demand for Lidoderm®," as a result of plaintiff's alleged misconduct, because "false statements, express or implied, that LidoPatch is equivalent to Lidoderm® will likely deceive a substantial segment of consumers who are prescribed Lidoderm into purchasing LidoPatch instead of Lidoderm®." GAIC App. 065

Plaintiff tendered its defense of the TPU lawsuit to plaintiff on March 19, 2012. On April 6, 2012, defendant advised

plaintiff of its position that it had no duty to defend or indemnify plaintiff with respect to the suit. Defendant reiterated that position on April 20, 2012. Then, on July 11, 2012, plaintiff tendered to defendant a copy of TPU's supplemental interrogatory responses in the underlying lawsuit, in which it accused plaintiff of wrongful conduct beyond the allegations in TPU's original complaint. Thereafter, on August 14, 2012, defendant agreed, under a reservation of rights, to provide plaintiff a defense in the underlying suit. But just eight days later, on August 22, 2012, defendant advised plaintiff that upon further review, defendant had determined that the policies' IP Exclusion barred coverage for the claims asserted in the underlying action, as well as any claim potentially suggested in TPU's supplemental interrogatory responses.

On September 5, 2012, TPU filed an amended complaint asserting substantially the same conduct as the original complaint and adding six additional causes of action under the deceptive trade practices, unfair competition, false advertising, and consumer protection statutes of Illinois, California, Nevada, Ohio, and New York. A letter from defendant's counsel to plaintiff's counsel addressed the amended complaint and reiterated defendant's position that it owed no duty to defend or

indemnify plaintiff with respect to the underlying suit.[4] Defendant articulated various bases for its position. Specifically, although defendant "acknowledge[d] that certain allegations could be viewed as supporting an implied claim by TPU against JAR for disparagement," it reserved the right to deny its defense and indemnity obligation on the basis that the amended complaint does not seek damages for "personal or advertising injury" as defined in the policies. GAIC App. 127 [DN 24-9]. Defendant then went on to state that it "expressly relie[d] upon the IP exclusion as the basis for its denial of a defense or indemnity obligation with regard to the Amended Complaint." GAIC App. 131. Defendant also reserved its right to rely on the "Quality of Goods Exclusion" as an "additional basis" to limit or deny its indemnity obligation. GAIC App. 132.

II.

All agree that my construction of the insurance policies is governed by Illinois law. *BASF AG v. Great American Assur. Co.*, 522 F.3d 813, 818 (7th Cir. 2008). In Illinois, "the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *Id.* at 818-19 (citing cases).

---

[4] The letter was dated August 31, 2012. Although the amended complaint had not yet been filed as of that date, there is no dispute that it had been sent in draft form to plaintiff and forwarded to defendant. Neither party claims that the draft addressed in the August 31, 2012, letter was different from the final version.

"In a duty-to-defend action, we begin with the deck stacked in favor of the insured." *Del Monte Fresh Produce N.A., Inc. v. Transportation Ins. Co.*, 500 F.3d 640, 643 (7th Cir. 2007). Accordingly, I construe the allegations of the underlying complaint liberally, and I resolve any doubts as to coverage in the insured's favor. *Id.* (citing *Ill. State Med. Ins. Servs., Inc. v. Cichon*, 629 N.E. 2d 822, 826 (Ill. App. Ct. 1994)). Indeed, "[a]n insurer may not refuse to defend its insured 'unless it is *clear* from the face of the underlying complaint [] that the allegations fail to state facts which bring the case within or potentially within, the policy's coverage.'" *Maxum Indem. Co. v. Eclipse Mfg. Co.*, 848 F. Supp. 2d 871, 880 (N.D. Ill. 2012) (quoting *LaGrange Mem'l Hosp. v. St. Paul Ins. Co.*, 740 N.E. 2d 21, 26 (Ill. App. Ct. 2000) (original emphasis and alteration).

The parties' threshold dispute is whether the allegations in the underlying complaint potentially fall within the policy's coverage of "personal and advertising injuries" resulting from "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." The question turns on whether the underlying complaints can reasonably be read to allege that plaintiff published statements "disparaging" Lidoderm. Defendant insists that they cannot,

arguing that the statements on which TPU bases its claims relate only to plaintiff's own product. Accordingly, defendants contend, the statements cannot fit within the policy offense of disparagement as a matter of Illinois law. This is the conclusion defendant insists is compelled by the Seventh Circuit's decision in *BASF AG,* in which the court noted that in Illinois, the common law of disparagement requires "that a false statement be made *about the plaintiff*." 522 F.3d at 819 (original emphasis). But defendant interprets the underlying complaint too narrowly on the one hand, while reading *BASF AG* too broadly on the other.

To begin, on its face the underlying complaint alleges that plaintiff's statements communicated "false/misleading messages" *about Lidoderm*. These include "messages" that "LidoPatch and Lidoderm® can be used to treat the same indication," that "LidoPatch is as effective as Lidoderm®," and that "LidoPatch and Lidoderm® are interchangeable." TPU Cmplt., GAIC App. 063 [DN 24-3]. These are the allegations of "the actual complaint, not some hypothetical version" of it. *BASF AG*, 522 F.3d at 822. That plaintiff's statements did not identify Lidoderm by name is immaterial, a point underscored by TPU's allegations about plaintiff's "messages." Whatever words plaintiff used, TPU clearly understood (and alleges that "a substantial segment of

consumers" would likewise believe, GAIC App. 065) that plaintiff's implicit "message" was *about* Lidoderm.

Moreover, plaintiff's literal statements can reasonably be read to identify Lidoderm® explicitly, if not by name. The statements compare LidoPatch to "the prescription brand," GAIC App. 063, and, in view of TPU's allegations elsewhere that Lidoderm is "one of the most frequently prescribed pharmaceuticals in the United States," and "one of the best-selling pharmaceutical patches of all time in this country," it is reasonable to interpret this language as an explicit reference to Lidoderm. GAIC App. 058. Accordingly, to the extent *BASF AG* requires "that a false statement be made *about the plaintiff,*" the underlying allegations meet this test.

In any event, the court's pronouncement in *BASF AG* must be understood in context. While it is true that the court analyzed the underlying complaints in that case through the lens of Illinois' common law of disparagement and found them lacking, the court articulated a multitude of reasons the complaints did not allege the covered offense of disparagement. The underlying lawsuits in *BASF AG* were consumer class actions alleging "a potpourri of antitrust, racketeering, fraud, misrepresentation, deceptive-trade-practices, and unjust-enrichment claims," in which the plaintiffs "pursued only economic damages for the injuries they suffered from the artificially high prices for [the

12

insured's product], which stemmed from the monopolization and fraudulent concealment" attributed to the insured. 522 F.3d at 816, 822. The disparagement alleged in the underlying complaints consisted of statements criticizing the work of a non-party (the researcher who concluded that the insured's product was not, in fact, superior to its competitors') and the quality of the competitors' products. The alleged disparagement was neither explicitly, nor implicitly, nor in any sense *about* the consumer plaintiffs at all, but instead targeted third-parties (or their products), who were strangers to the litigation. As the court explained, not only did the underlying plaintiffs lack standing to bring any claim for "disparagement" on these facts, but the injury they alleged stemmed not from disparagement but from the insured's anticompetitive scheme, of which the disparagement was allegedly a part. Indeed, the court underscored the importance of "focusing on the tortious conduct on which the lawsuit is based" and concluded that the consumer class actions articulated a "paradigmatic antitrust injury." *Id*. at 822. Accordingly, the court declined to allow the insured to "shoehorn these collateral claims" into the policies' coverage of disparagement. *Id*.

In the present case, the question is not whether allegations of tortious anticompetitive activity that includes false statements about non-parties and competing products can be construed as "disparaging" Lidoderm. Rather, it is whether

13

allegations of false advertising based on misleading comparisons between LidoPatch and Lidoderm trigger defendant's duty to defend plaintiff against claims for "advertising injury" based on disparagement. To the extent the *BASF AG* decision offers any guidance at all on this question, it militates in favor of coverage because the allegedly false statements in this case identify Lidoderm explicitly (by reference to "the prescription brand"), and implicitly (through the "messages" they allegedly convey), and are thus *about* Lidoderm.

This does not end the question, of course, since the alleged statements must also portray Lidoderm in a negative light to qualify as disparagement. Plaintiff argues that statements portraying LidoPatch--an allegedly inferior product--as equivalent to Lidoderm meet this test, citing *Acme United Corp. v. St. Paul Fire & Marine Ins. Co.*, 214 Fed. App. 596, 2007 WL 186247 (7th Cir. 2007) ("[d]isparage means 'to discredit or bring reproach upon by comparing with something inferior.'" (quoting *Webster's Third New International Dictionary* (unabridged) 653 (1981)), and *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir. 1988) ("a misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer."). Defendant strains to distinguish *Acme* on the ground that the underlying complaint in that case asserted statements that the insured's product was

"superior" to its competitors' rather than merely "equivalent" to them, as here. I agree with plaintiff, however, that a statement equating a competitor's product with an allegedly inferior one is logically indistinguishable from, and no less disparaging than, a statement describing one's own product as "superior" to the competitors'.[5]

In addition, TPU alleges that plaintiff's statements have "damage[ed] Lidoderm®'s goodwill," and "divert[ed] Lidoderm® sales." GAIC. App 057. This bolsters the conclusion that the allegedly misleading statements disparaged Lidoderm. *See Lexmark Intern., Inc. v. Transportation Ins. Co.*, 761 N.E. 2d 1214, 1225 (Ill. App. Ct. 2001) (disparagement requires untrue or misleading statements about a competitor's goods that are "made to influence or tend to influence the public not to buy.") (internal quotations and citations omitted).

In short, I conclude that the underlying complaints allege false statements about Lidoderm, and that the allegedly false statements can reasonably be construed as falling within the scope of the "advertising injury" of disparagement. Accordingly, defendant owes plaintiff a duty to defend against TPU's suit

---

[5] Defendant also seeks to distinguish *Acme* on the basis that the Seventh Circuit applied Wisconsin law in that case. That distinction is irrelevant, however, because the *Ames* court relied on dictionary definitions to ascertain the meaning of the term "disparage," a practice roundly endorsed by Illinois courts. *See Valley Forge Ins. Co. v. Swiderski Electronics*, 860 N.E. 2d 307, 316 (Ill. 2006).

unless any of the policies' exclusions applies. It is to that question that I now turn.

In its own motion for summary judgment, defendant asserts that the "IP Exclusion" and the "Quality of Goods Exclusion" as excuse it from any duty to defend plaintiff in the underlying suit. In response to plaintiff's motion, defendant also cites the policies' "Prior Publication" exclusion as barring coverage of the underlying suit. I analyze each exclusion in turn.

At the outset, I note that consistent with Illinois' policy that "insurance policies are to be liberally construed in favor of coverage," *United Services Auto. Ass'n v. Dare*, 830 N.E. 2d 670, 678 (Ill. App. Ct. 2005), provisions limiting or excluding coverage "are also construed liberally in favor of the insured and against the insurer." *American Economy Ins. Co. v. DePaul University,* 890 N.E. 2d 582, 588 (Ill. App. Ct. 2008) (citation and internal quotation omitted).

Defendant does not dispute that the underlying complaints make no allegations of intellectual property infringement or contest that TPU has no trademark rights with respect to Lidoderm. The essence of defendant's argument is that because the underlying complaints assert Lanham Act claims and state law claims that "sound in theories of unfair competition and unfair or deceptive trade practices, or other similar practices," Def.'s Opp. at 8 [DN 29], and because these laws are properly

16

characterized as laws "concerning unfair competition," the underlying complaints trigger the IP Exclusion's coverage bar for "any actual [or] alleged violation of…any…laws or regulations concerning…unfair competition, unfair trade practices, or other unfair similar practices." But this sweeping construction of the exclusion is not supported by the authorities defendant cites, and it flies in the face of both Illinois' policy and plaintiff's reasonable expectations about the scope of coverage.

First, defendant cites several authorities for the unobjectionable premise that the Lanham Act protects against unfair competition: *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (trade dress infringement); *NuPulse, Inc. v. Schlueter Co.*, 853 F.2d 545, 549 (7th Cir. 1988) (trademark infringement); and *Waits v. Frito-Lay*, 978 F.2d 1093 (9th Cir. 1992) (misappropriation of voice/false endorsement). These, however, do not support defendant's argument that allegations of "unfair competition," however unmoored from any intellectual property right, are excluded by the IP Exclusion. Indeed, in each of the foregoing cases, as well in as those defendant cites for the remainder of its argument, the unfair competition alleged was the infringement or misappropriation of a specific intellectual property right. *See S.B.C.C., Inc. v. St. Paul Fire & Marine Ins. Co.*, 186 Cal. App. 4th 383 (Cal. App. Ct. 2010) (trade secret misappropriation); *Ventana Med. Syst., Inc. v. St.*

*Paul Fire & Marine Ins. Co.*, 709 F. Supp. 2d 744, 758 (D. Ariz. 2010) (patent infringement); and *Molecular Bioproducts, Inc. v. St. Paul Mercury Ins. Co.*, No. 03-0046-IEG, 2003 WL 23198852 (S.D. Cal. July 9, 2003) (patent infringement). Accordingly, they offer no meaningful guidance here.

Second, defendants' proffered construction of the IP Exclusion as barring every conceivable species of claim alleging "unfair competition" ignores the context in which that phrase appears. Read in context, it is clear the provision excluding claims of "unfair competition, unfair trade practices, or other unfair similar practices," bars coverage only of *intellectual property claims* based on such allegations. It does not convert every claim asserting "unfair competition" into an intellectual property claim. Otherwise, the term "intellectual property" that appears both in the exclusion's heading and in its text would have no meaning, and the exclusion would negate claims a reasonable insured would expect to be covered based on the plain language of the exclusion.

Defendant insists, nevertheless, that I should ignore that the exclusion is titled "Exclusion of Claims and 'Suits' Alleging Infringement of Intellectual Property" and disregard the repetition of this phrase in the caption introducing the relevant section. Defendant cites *Pekin Ins. Co. v. Tovar Snow Professionals, Inc.*, 970 N.E. 3d 534, 537 (Ill. App. Ct. 2012),

18

for the proposition that "a heading or caption or title to a section of an insurance policy does not modify the coverage provided by the actual textual language appearing in the policy." But in *Pekin*, the issue was whether to *restrict* coverage by *expanding* the scope of an exclusion based on a single word that appeared only in the exclusion's heading. The *Pekin* court rejected such a construction as inconsistent with Illinois policy, citing *Barth v. State Farm Fire & Casualty Co.*, 886 N.E. 2d 976 (Ill. 2008), for the proposition that "a contract term only used in a heading and not in the text and otherwise not defined *cannot properly be imposed on an insured to exclude coverage.*" (Emphasis added) *Pekin* did not remotely countenance restricting coverage by deleting a limiting term from the caption of an exclusion.

Moreover, the term "intellectual property" appears not only in the exclusion's headers, but also in its text. As plaintiff observes, the IP Exclusion begins by enumerating the excluded claims, beginning with the most specific and ending with the most general. The last, "catch-all" exclusion (listed just after the section on which defendant relies), excludes "any *other* intellectual property right or law." (Emphasis added). The clear import of this final phrase is that the preceding subsections likewise referred to intellectual property rights or laws. *See Align Technology, Inc. v. Federal Ins. Co.*, 673 F. Supp. 2d 957,

990-71 (N.D. Ca. 2009) (declining to construe "unfair competition" exclusion broadly where "such a broad definition would stretch the term far beyond its context embedded within an exclusion for 'intellectual property'" and would "disappoint the reasonable expectations of the insured, violat[ing] the general rules of construing insurance contracts…in favor of the insured.") In short, Illinois policy, legal authority, and the language of the exclusion itself all militate in favor of construing the "unfair competition" exclusion as targeting a narrow subset of intellectual property violations that does not include TPU's false advertising and related claims.

Nor does the "Quality of Goods Exclusion" relieve defendant of its duty to defend. Defendant compares the instant case to *Skylink Technologies, Inc. v. Assurance Co. of America*, 400 F.3d 982 (7th Cir. 2005), but the comparison is inapt. In *Skylink*, the insured advertised its product--a universal garage door opener--as "compatible" with the underlying plaintiff's door-opening device. Although the signals sent by the insured's opener could indeed be received by the plaintiff's device (i.e., the door would open), the opener negated the device's unique security features. The plaintiff sued the insured, asserting claims for false advertising and copyright infringement, and the insured sought coverage under its policies' coverage of suits alleging "advertising injury."

The *Skylink* court first rejected the insured's argument that the underlying suit asserted a covered claim for disparagement based on an alleged "false comparison."  The court explained that in a "clear case of disparagement resulting from a false comparison," the claimed injury--harm to reputation-- results from the publication of the disparaging advertisement.  400 F.3d at 985.  The underlying plaintiff in *Skylink*, by contrast, claimed that its reputation was hurt not by the insured's representations, but because the insured's product compromised the proper functioning of the plaintiff's product.  This is clearly distinct from the claim here, which, as I have already determined, *does* allege disparagement.

The *Skylink* court went on to reject the argument that the underlying suit was based on "misappropriation" (a covered offense in that case), again reasoning that the underlying "complaint is not the result of Skylink's use of its name or those phrases on Skylink's packaging, it's the fact that Skylink's products bypass the rolling code technology.  The problem is not one of misappropriation but of a failure to live up to an advertised promise."  *Id.*

The *Skylink* court's rationale belies defendants' argument that the fact that LidoPatch was never released for sale is "irrelevant" to the applicability of the Quality of Goods Exclusion.  Unlike the underlying plaintiff's claims in *Skylink*,

TPU's claims allege injuries flowing directly from plaintiff's advertisements, not from consumers' discovery that the advertisements were false.

Nor does the North Carolina supreme court's decision in *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC*, 692 S.E. 2d 605 (N.C. 2010), upon which defendant also relies, persuade me that the Quality of Goods Exclusion applies here. That court's conclusion that a quality of goods exclusion applied was premised on the fact that the false statements alleged were about the insured's product, not about the underlying plaintiff's. The court observed that the policies at issue "do not cover injury caused by false statements an insured makes about its own products. It is the [] policies' 'Quality Of Performance of Goods—Failure to Conform to Statements' exclusion…that eliminates any coverage for these types of false statements." *Id*. at 608. As I explained above, the underlying complaints in this case do allege false statements about Lidoderm. Accordingly, the court's reasoning in *Harleysville* is unpersuasive.[6]

This brings me to defendant's final argument with respect to its duty to defend, which is that the policies' "Prior Publication Exclusion" bars coverage for TPU's amended complaint.

_____

[6] The same distinction applies with respect to *Total Call Intern., Inc. v. Peerless Ins. Co*., 181 Cal. App. 4th 161 (Cal. App. Ct. 2010), on which defendant also relies.

This exclusion eliminates coverage for "Personal and advertising injury' arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." Defendant argues, in essence, that because TPU alleges some offending activity prior to the inception of coverage, all of the allegedly wrongful activity is excluded. Defendant cites allegations in TPU's amended complaint that in June of 2011, plaintiff's agents "contacted numerous potential customers regarding the LidoPatch product and falsely represented to those customers that LidoPatch was an over-the-counter version of Lidoderm® with the sole difference being a lower concentration of lidocaine" and that "LidoPatch would be effective for up to 24 hours even though neither [plaintiff] nor any other person had any reason to believe such representations to be true." Defendant then strains to characterize the specific false statements plaintiff allegedly made during the coverage period (including all of the statements excerpted above from the chart at ¶ 20 of the original complaint and ¶ 28 of the amended complaint) as mere "republications" of material first published prior to the inception of coverage.

Defendant argues that all of the statements made during the coverage period amount to "substantially the same material" plaintiff allegedly published in 2001. Citing *Ringler Associates Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165 (Cal. App. Ct.

23

2000), defendant argues that plaintiff's later statements are therefore barred. Again, defendant's reliance is misplaced. In *Ringler*, the underlying plaintiff alleged a "conspiracy" to "boycott and injure the plaintiffs through various alleged practices, including the publication and dissemination of false, disparaging, defamatory and derogatory statements." *Id*. at 1172-73. Notably, while the underlying lawsuits were filed shortly after the inception of the plaintiff's policies, the alleged wrongdoing began years earlier. Moreover, the factual record was bereft of a single, specific defamatory statement made within the coverage period. The insured argued for coverage on the basis that the insurer "failed conclusively to 'eliminate the possibility' of separate, different defamatory utterances first occurring" during the policy period. *Id*. at 1183. The *Ringler* scenario cannot be likened to the one in this case. Here, each specifically identified false statement was made within the coverage period, while the earlier statements are the ones alleged only generally. Moreover, the very nature of the claim in *Ringler*--for conspiracy--suggests an ongoing scheme of wrongdoing. Nothing in the underlying complaint similarly suggests that the covered statements were merely the continuation of a defamatory scheme that began before coverage incepted.

For all of the foregoing reasons, I conclude that defendant owes plaintiff a duty to defend plaintiff in the underlying suit,

and that none of the policy's exclusions excuses defendant from that duty. This resolves the parties' cross motions for summary judgment of their respective declaratory claims, as well as plaintiff's motion for summary judgment of its contractual claim, to which defendant raises no opposition separate from its opposition to the declaratory claim. I now turn briefly to defendant's request for summary judgment of plaintiff's claim under 215 ILCS 5/155.

In its opposition, plaintiff asks that I defer ruling on this portion of defendant's motion, arguing that it is entitled to discovery on the issue. But as plaintiff's own cited authority acknowledges, it is well-settled in Illinois that "where a bona fide dispute concerning coverage exists, the insurer's actions in denying or delaying coverage are not vexatious and unreasonable and that sanctions and costs are therefore not appropriate." *Knoll Pharmaceutical Co. v. Automobile Ins. Co.*, 210 F. Supp. 2d 1017, 1028-29 (N.D. Ill. 2002). Whatever may have been the reason for defendant's flip-flopping on whether it would defend plaintiff, the present record amply establishes a bona fide dispute concerning coverage.

III.

For the foregoing reasons, plaintiff's motion for summary judgment is granted. Defendant's motion for summary judgment is granted only to the extent it seeks judgment in its favor of count III of plaintiff's complaint and is otherwise denied. Accordingly, judgment is to be entered for plaintiff on counts I and II of its complaint, and on counts I through VII of

defendant's counterclaim.  Judgment is to be entered for defendant on count III of plaintiff's complaint.  Finally, plaintiff's motion to strike defendant's affirmative defenses is denied as moot because this decision precludes defendants from relying on the affirmative defenses challenged in that motion.

**ENTER ORDER:**


**Elaine E. Bucklo**
United States District Judge


Dated: May 10, 2013